## LITTLE ROCK AND FORT SMITH RAILWAY COMPANY VS. PAGE.

1. TRUSTEES: *Railroad directors: Their sales to themselves, how and by whom avoided.*

   Directors of a railroad company stand in the relation of trustees to the stockholders and creditors of the road, and are not allowed, in chancery, to deal with it at all, for their individual benefit; but their contracts for the sale of any part of its property to one of their number, are not void at law; they are only voidable in equity at the instance of any one interested in the property of the road. Such sale can not be avoided at law by a new company (which, by purchase of its property and reorganization, has succeeded the old) obtaining possession of the property sold, and refusing to deliver it to the purchaser.

2. DELIVERY: *What constitutes.*

   What constitutes delivery depends upon the situation and character of the property. Removal from the premises is not necessary. It is sufficient if the contract of sale has been definite and unconditional, and everything has been done in pursuance of it by the vendor, which is necessary to identify the property and separate it from other, so that it may be known what, specifically, has been sold.

3. SALE. DELIVERY: *Retaining possession by vendor: Fraud.*

   The retention of possession of property by the vendor is not conclusive evidence, but only a badge, of fraud.

4. RELEASE: *Of all demands, etc.: Construction of.*

   When one who has sundry claims or demands against another, upon settlement, executes to him a release and discharge "from all claims and demands of every name and nature" which he holds against him, such release will cover all articles of property known by the releasor at the time to be held and claimed by the releasee as his own.

5. MORTGAGES: *Of future acquisitions.*

Mortgages of future acquisitions of property by railroad companies, are upheld in equity and liberally construed. Equity treats a mortgage of property to be afterwards acquired, as a contract binding in conscience, to execute a mortgage upon it at the instant it comes into being, and will enforce specific performance. It does more. It considers it as already done if no specific performance be requested; and then binds everybody to respect the equitable lien who knows of it, or without knowing of it has got the property without valuable consideration.

APPEAL from *Pulaski* Circuit Court.

Hon. J. W. MARTIN, Circuit Judge.

*Clark & Williams*, for appellant.

*Kimball, contra.*

EAKIN, J. Page sued the railroad company for the conversion of " thirty-five iron, French switches," of which he was the owner, and entitled to the possession; and which, he alleges, the defendant, on the fifteenth day of March, 1877, unlawfully took and converted.

The answer is in three paragraphs:

1. Denied the ownership of plaintiff.

2. The alleged taking and conversion.

3. Set up a release of plaintiff to defendant of all claims or demands on account of these switches, of the thirteenth of April, 1876.

Upon trial, a jury rendered a verdict in plaintiff's favor for $2,625. Defendant moved for a new trial, and that being denied, excepted and filed a bill of exceptions. An appeal was afterwards granted by the clerk of this court. The evidence is important, and must be set out with some degree of fullness, in order to understand the application of the law to the facts.

On the twenty-ninth of November, 1873, five directors,

20

constituting a quorum of the Little Rock and Fort Smith Railroad company, plaintiff being one, met as a board, and accepted a proposition from plaintiff to purchase of the company one hundred Arkansas state aid bonds, then held by him, as collaterals, to secure a loan, to the company for the sum of $12,500; and, also, a like proposition to purchase, for the sum of $10,000, from the company, " all new rails, rail fastenings, frogs, switch rails, switch-stands," then owned by the company in the state, and not then laid and in use by said company. "including track and material now laid for temporary use from the Memphis and Little Rock railroad depot, at Argenta, to the junction with the Cairo and Fulton railroad, and now used by trains." The bonds were to be paid for by a credit to the company on an account for moneys advanced by Page in procuring a loan for the company; and the other things, by a credit upon moneys advanced by Page, which had been approved by the board.

The resolution accepting the offer, directed the snperintendent, Beaumont, to deliver the property, and a certified copy of the resolution was directed to be given him for his authority. The whole five directors made a bare quorum, and Page himself, though present, did not vote on the resolution.

The iron switches were then lying on the company's premises, near the bank of the river. Beaumont, being advised of the sale, upon Page's request, had them taken from the river bank and placed near the company's enginehouse, also on the premises. Page also took possession of the road iron, and sold it to other parties. His account against the company amounted to $42,596.20, and was advanced to enable the company to pay interest on the state aid bonds, and for other purposes. He was, at the time,

state treasurer, and the payment of said interest was made to him as such. In his evidence he says he never saw the switches after Beaumont removed them, as his agent, and always supposed they remained where placed, until he demanded them of the superintendent of the present company. The old company was sold out under the mortgages, and the present company had come into possession of the road and all its property, in December, 1874. Page had ceased to be a director in May of that year, and a new superintendent, Hartman, had been appointed, who remained superintendent upon the new organization. Page did not inform him of his claim upon the switches, or demand them of him, until a short time before action brought.

The iron rails, mentioned, had been sold by Page to the Memphis and Little Rock Railroad company for $10,000, and four notes taken for the purchase money, of $2,500 each.

The mortgages spoken of had been afterwards foreclosed in the federal court, in which suits commissioners had been appointed to audit and allow claims against the old company. Page appeared before these commissioners and proposed to transfer to them the notes given for the iron, and make a certain release. They accepted the proposition, paid Page the money for the notes, and took from him the following release—on the day of its date :

"In consideration of one dollar, and other valuable considerations, to me paid by the Little Rock and Fort Smith Railway, I hereby forever release the Little Rock and Fort Smith Railway, and the Little Rock and Fort Smith Railway company, and them discharge, from all claims and demands, of every name and nature, which I hold against them, or either of them. Witness my hand and seal, this thirteenth day of April, 1876.

"HENRY PAGE. [Seal.]"

He says that, at the time of the execution of this instrument, he considered the switches his own, and supposed they were where Beaumont had placed them—having no knowledge that Hartman, or the defendant, had used them; and, further, that the debt or claim upon which the old company sold the switches to him, was not any part of the claim settled by the defendant. The new company had succeeded to the books of the old, which showed the whole of the former transaction. His claim against the old company, he says, was only for the balance.

The switches were purchased by the old company in 1872, or early in 1873, with the intention of using them, but that intention had been abandoned at the time of the sale to Page. They did not suit the size of the railroad iron. Afterwards, it had been found that they could be utilized for the purposes of the road. It also appears that when the sale was made the old company was much embarrassed, and that it was hiding other property to avoid attachment.

Hartman, for defendant, testified that he had served as superintendent for the old and new companies since May, 1874, succeeding Beaumont. He took possession of the switches, with the other property of the road, supposing they belonged to it, but did not disturb or use them whilst the old company existed. Did not know of Page's purchase. Took the switches and had them laid down in the road-track during the years 1875 and 1876. Fourteen of them were used before the thirteenth of April, 1876 (the date of the release), two by Beaumont and twelve by Hartman, and all, afterwards, save one, which was defective. Page, during that time, was frequently in Argenta (where the switches were), and often traveled over the road. He never objected to our taking and using the switches, nor

set up any claim to them. The switches were worth from $120 to $130 each.

. It is admitted that at the time the release was executed to the defendants, they, in pursuance of the contract, paid plaintiff $25,500.

This was the substance of the evidence admitted by the court.

The defendant offered, but was not allowed, to introduce as evidence, a deed of trust executed by the old company on the twenty-second of December, 1869, of its road, depots, houses, franchises, etc., rolling-stock, "and all personal property of every nature, kind and description whatsoever, now held or acquired by the said company, its successors or assignees, for use in connection with the railroads or branches of the party of the first part, or with any part thereof, or with the business of the same," to secure the payment of the principal and interest of $3,500,-000 of coupon bonds to be issued. Said deed empowered the trustees therein named, upon default in payment of the principal or coupons of the bonds, to take possession of the road and run it, or, in certain contingencies, to sell and apply the proceeds to the payment of the bonds, or interest. There were various stipulations and minute provisions not affecting the issue here, but it was provided specially that the trustees, at the request of the company, should have power "to allow the said company, from time to time, to dispose of, according to its discretion, such portions of the equipment, machinery and implements at any time held or acquired for the use of said railroad, as may have become unfit for such use, replacing the same by new, and which shall be conveyed by the said company to the trustees, and made subject to the lien." Another clause gave the trustees themselves power, on the written request of

the company, to convey or release "any lands or property which, in their judgment, shall not be necessary for use in connection with said railroad." The deed was duly executed, acknowledged and recorded in this county. The company covenanted from time to time to give such further assurances as might reasonably be deemed necessary, and be requested by the trustees.

Defendant also offered, but was not allowed, to introduce a decree of the federal circuit court for this district, rendered November 6, 1874, foreclosing the mortgage and decreeing a sale for the payment of the bonds, on the tenth of December following, of the road and other premises mentioned in the bill and exhibits, "and all other personal property of every nature now held or acquired by the said company for use in connection with the railroad or branches of said company, or with any part thereof, or with the business of the same," * * * "as well as all other personal property of any and every name whatsoever, in said mortgage mentioned, all to be sold together in one parcel." A special Master was appointed to carry the decree into effect.

Defendant further offered in evidence two other decrees of the same court, of the nineteenth of December, 1869, rendered on the Master's report of sales. One of these decrees would show that the property was purchased by three trustees, for the purpose of organizing a new company, which had been done, upon the terms that any bondholder, secured by the foreclosed mortgage, might transfer his bonds to the new company, relinquish his rights to the proceeds of the sale, and become entitled to a proportionate share in the new stock. It would further show that the court confirmed the sale on these conditions, and directed the Master to convey the property to the new

company (which is defendant here), stipulating in the order as a part of its consideration, that said new company should compromise, or pay, such claims against the former company as three persons therein named might, within one year from that date, approve, upon such terms and in such manner as they might prescribe. The other decree was of a similar nature, applicable, however, to other property. We collect from the papers offered in evidence, though somewhat vaguely, that there were two suits progressing in the federal court *pari passu*, upon two mortgages to secure the same bonds, but of different property; and the object of the evidence was to show that the same arrangement had been made in both cases, by which the property of the old company was to be transferred to a new company, consisting of the beneficiaries in the mortgages, upon certain conditions, to protect claimants against the old company, who might present them to commissioners to be audited, and which might be approved. These decrees were admitted only for the purpose of explaining and showing the meaning and purpose of *the release* executed by Page; but the jury were instructed not to regard them for any general purpose of showing title in defendant to the property in question.

Defendant then introduced the report on the claim of Henry Page, made to the court by the commissioners appointed to audit claims against the old company, marked exhibit "F." This report sets forth the nature and origin of the original debt, and the compromise offered by Page, with the recommendation that the company accept the notes offered to be transferred by Page, for which the railroad iron was sold to the Memphis and Little Rock company, and his release of all claims and demands " of any and every nature," and that the new company pay Page

the sum of $25,500. Nothing is said of the French switches, or the ownership of them.

The court then, for the plaintiff, and against the objections of defendant, instructed the jury, in effect: That if they believed that the old company had, in good faith, sold the switches to plaintiff; and that they were then lying on the river bank, and had not been used by the said company, and there was no intention to use them then entertained by the company; and that they were delivered to plaintiff, and he gathered them up and took possession, and was permitted to keep them on the vendor's premises; and defendant afterwards, without the knowledge or consent of plaintiff, took and used them; and afterwards refused, on demand, to deliver them, they should find for the plaintiff and assess for damages the value of all so converted after the date of the release.

The defendant asked four instructions, which were all refused, in effect as follows: 1. The jury must find for defendant if they found that plaintiff was a director of the company at the time of the purchase. 2. That if they found that plaintiff agreed with the old company for the purchase of the switches, for a credit to be allowed on a prior indebtedness, that it was to be held an executory contract not to take effect without delivery, and that a direction of the superintendent of the old company to remove the property from one part of the company's premises to another was not a delivery sufficient to complete the sale, as against assignees in good faith of the company. 3. That if they found that plaintiff had submitted his claims against the old company to the commissioners appointed under the decree of the nineteenth of December, 1874, and acquiesced in the report and accepted the award, they must hold him bound by its provisions, as well as its

legal purport; and if the defendant was then in the possession of said switches, as assignee of the old company, then the execution of the release, given in evidence, was a release of all claim to them. 4. That if they believed the switches were, when purchased and afterwards remained, in the possession of the old company, without other delivery than by moving them from one part of the premises to another; and that defendant took possession of them by virtue of the purchase of the railroad and all its property, and had used a portion of them before the release, such possession and claim was to be held established, as made the release effectual to bar the plaintiff.

The court modified the third instruction, however, by instructing the jury that if the defendant, represented by said commissioners, was, by its superintendent, in possession of said switches as assignees of the old company, and had converted them at the time of release, then it would amount to a release of all claim to the same on the part of plaintiff.

The court, of its own motion, then instructed the jury that the failure on the part of a vendor to deliver personal property sold is not conclusive evidence of fraud, but only a badge of it. The jury are to consider all the circumstances of the case, and the true test is good faith or pretense. The plaintiff must show title in himself, and conversion by defendant, and he converts who takes possession of property and exercises a control and disposition of the property adverse to and in exclusion of the owner; that plaintiff can not recover in this suit for switches converted before the release, but may for those converted afterwards.

The grounds for new trial, alleged in the motion, were:

1. The refusal to give defendant's instructions, severally.

Little Rock and Fort Smith Railway Company vs. Page.

2.   The refusal to give and the modification of his third instruction.

3.   The giving of instructions by the court, verbally, of its own motion, which were afterwards reduced to writing.

4.   That the court withdrew from the jury the question whether the remaining switches, at the time of the release, were within the purview and operation of the release, and deciding as a matter of law that they were not.

5.   That the court refused to allow the mortgage to be used in evidence.

[The same as to the decree of the sixth of November, 1874, foreclosing it.]

6.   The refusal to admit the two decrees of the nineteenth of December, 1874, for the purpose of proving title.

7.   Because the jury found contrary to law and evidence.

TRUSTEES: Railroad directors. Their sales to themselves; How and by whom avoided.

The first question which demands attention is raised by defendant's first instruction. Was the sale to Page void because he was a director? That it was voidable in equity at the option of any one interested in the property of the railroad, is too well settled to admit further discussion.

The directors all stood in the relation of trustees to the stockholders and creditors of the road, and would not be allowed, in chancery, to deal with it at all for their individual benefit. But such contracts are not void at law. The interposition of a court of equity to set them aside is essential. Until that is done they remain valid, and can not be collaterally attacked, in a suit at law, by strangers or by parties. A corporation is a person distinct from the individuality of its directors. There are here two parties competent to make a contract—Page and the corporation—and there is no rule of law to prohibit them from doing so. The rule belongs to equity, which derives its jurisdiction to in-

terfere from the fact that courts of law do not take cognizance of these trusts, and only moves at the instigation of those who have been or may have been injured. (*Story's Equity, 321–2–3.*) Until so canceled, such contracts are good.

Defendants contend that the possession by the new company, and refusal to deliver, amounted to a renunciation of the contract and avoided the sale. Assuming the sale to have been complete in the first place, it can not be thus avoided. That doctrine is confined to cases where there is a legal power of rescission, arising from actual fraud, or misrepresentation. The hand of the Chancellor was necessary in a case like this, which should have been invoked by cross-bill, and transfer of the case to the equity court. There the relief could be properly moulded upon equitable terms with regard to the consideration paid. The court committed no error in this regard.

The second instruction regards the completion of the contract of sale, and taken in connection with the evidence, was so framed as to impress the jury with the idea that the circumstances proved did not amount to such a delivery as would transfer the property. We think it was erroneous, and properly refused. What constitutes delivery depends on the nature and situation of the property. Asportation from the premises is never necessary. It is always sufficient if the agreement be definite and unconditional, and everything has been done in pursuance of it, on the part of the vendor, which may be necessary to identify the property, and separate it from others, so as it may be known what, specifically, has been sold. In this case, Beaumout, the superintendent of the company, was advised by the board of the sale, and acting for it, and also for Page, separated the switches and piled them to themselves. *2. DELIVERY: What constitutes.*

3   SALE.
DELIVERY:

Retaining
possessio n
by vendor:
Fraud.

The sale, as against the old company, was clearly complete, and vested in Page the legal title as fully as the company had it before. It held, afterwards, simply as a bailee without hire, being in no sense owner. It is a different question whether such leaving in possession would be a fraud upon subsequent purchasers or incumbrancers, whereby Page might have lost the benefit of his trade. But this aspect of the case was fully presented by the instruction given by the court on its own motion. They were properly advised that this is only a badge of fraud, but not conclusive evidence; that they should consider all the circumstances of the case, and that the true test was whether the purchase was made in good faith, or as a pretense. This is the modification of the doctrine in Twynne's case, which now prevails in almost all the American states, and which has been rendered necessary by the vast increase of personal property, its ponderous or bulky nature, and the exigencies of business. It would be in the highest degree embarrassing if failure to remove property at once should be held *conclusive* evidence of fraud or secret trust.

4. RELEASE:
Of all de-
mands, etc:
Construc-
tion of.

The third instruction regarded the effect of the release. The court refused to instruct the jury in effect that if the defendant was in possession of the switches as assignee of the old company when the release was executed, it amounted to a relinquishment of his property in favor of the new company; that if he acquiesced in the report of the commissioners and accepted the award for which the release was partly executed, he was bound by its provisions and legal purport.

Such an instruction presupposes the provisions and legal purport of the award to have been that, as a condition to the payment to Page of the money specified, he should, on

his part, release to the company all his right to these switches then in its possession.

The report of the commissioners making the award was admitted in evidence, and a fuller notice of its purport may be, in this connection, advisable. The claim presented to them by Page was for a balance due on a note of the old company for $31,000, dated September 2, 1871, and due at fifteen days. It was given for money which he had raised and advanced to the state to pay interest coupons on $900,000 state aid bonds, as to the validity of which no question was then raised by any of the parties. The old company was liable to sequestration if the interest had not been paid, and had no available means. Page did not then have any security, but was assured by some of the largest bondholders, before the foreclosure, that after the reorganization his claims would be settled on an equitable basis. In March, 1873, he received on this claim $100,000 of state aid bonds, which he sold at $12.50 per hundred and credited on the note. This was all that had been paid on this debt, and the balance, with interest, at the time of the report, amounted to near $30,000.

They reported, further, that Page represented to them that, being authorized thereto by the old company, he had, in February, 1874, sold to the Memphis and Little Rock Railroad company a lot of iron, for four notes of $2,229.97 each. But it had been contended that the old company did not have the right to sell this iron without the assent of the trustees in the mortgage, and notice had been given the Memphis company not to pay, and Page had brought suit, which was then pending. And, in conclusion, that Page had offered to transfer to the new company his interest in these suits, and execute a release of all demands or claims of every nature against both companies, in consid-

eration of the sum of $25,500, which they recommended should be accepted.

The effect of the third instruction, if given, would have been to take from the jury the consideration of the question whether or not the circumstances existing at the time of the release, showed that Page, by it, intended to abandon his claim or right of ownership to the switches in question. That was a matter of fact proper for the jury. It belonged to the court to explain to the jury the legal effect of the instrument, and the meaning of the words "claims or demands;" but it was the province of the jury to apply that effect to the facts, and ascertain from them whether the right of ownership in the switches now asserted by Page, was then understood by him to be so clouded with an adverse claim on the part of the new company as to fall within the definition of a *claim* or *demand* as given by the court.

Ordinarily it is obvious that the mere friendly custody of another's property does not constitute such a claim or demand on the other side as would transfer the property, or estop the owner upon his execution of a general release of claims and demands. It is just as obvious, however, that such a release would have that effect, if the owner knew that the other did not concede to him the title and right of possession, but claimed it as his own. The *application* of the instrument would depend upon facts. The court did not err in refusing defendant's third instruction as asked. The modification of it, however, although strictly correct, was likely to mislead the jury. It should have gone further and advised them that not only a conversion of the switches by use, but a claim to own them, known to Page, would bring them within the scope of the release. It may be remarked here that the title by

which Page claimed the switches was precisely that by which he had claimed the right to the iron which he had sold to the Memphis and Little Rock company; that he knew his claim to this iron was resisted by the trustees in the mortgage, and the purchasers under it; that he had given up the proceeds of the iron with the release, and accepted $25,500 as a compromise. The jury might and should have been allowed to find, from the circumstances, whether or not Page knew that the company had claimed or would claim the switches adversely; and they should have been instructed that if they found that he did know it, then his release would cover it, and bind him as to this property also.

The fourth instruction asked was obviously erroneous. The sale was complete, as we have said, without removal of the property from the premises, and the conversion of part of the property, without Page's knowledge, could not advise him of adverse claim to the rest.

In short, we are of the opinion, that the court did not err in refusing the third and fourth instructions asked by the defendant, in the form proposed; but we think, in modifying the third, and in giving the additional instruction on its own motion, the court did not present to the jury the true issue of fact upon which the effect of the release turned. It was admitted in all parts that the old company had the actual possession of the switches which had passed to the new company also. It was not contended that the plaintiff could recover for any which had been *actually used* before the release. The court properly defined what would amount to a conversion, and instructed that the plaintiff could not recover for any which had been so *converted* before the release, but it left the jury to believe that they must render a verdict for all which had *not* been

so converted—in other words, that conversion by one at the time was necessary to bring the switches under the operation of the release. So far, it was erroneous. Reason, good faith, and justice, require that Page should be held bound by his compromise, with regard to the switches also, and that his claim thereto should be included in the release, if the jury should find that he knew that his claim to the same would be resisted when made, as the claim for the iron had been; although the commissioners who made the compromise, and the defendant itself, may not at the time have known of the claim, nor have done any act amounting to a conversion. The release was intended to be a complete quietus, and was framed in broad and sweeping terms for the purpose. Whilst it would make it a snare to Page to make it divest him of any of his property upon defendant's premises, which he had no right to apprehend would be contested, it would be equally illusory to the defendant, to hold it not applicable to such property in its possession as it claimed as its own, and to which Page knew, or had plain reason to know, his claim would be resisted when made. It was just such latent claims that the release was intended to quiet—and by its legal construction it should quiet not only everything in the nature of a chose in action, upon which a suit might then have been maintained (as, for instance, the switches already used), but, also, everything concerning property in defendant's possession, concerning which Page might believe there would be contention, on the attempt to assert his right. There being no question of the release, nor of defendant's possession, the question of its scope and effect was not one of conversion, wholly. It certainly covered what had been converted, and so the court instructed. For the rest, the question of fact for the jury was Page's actual knowledge, or reasonable grounds of ap-

prehension, that his claim would be resisted. If he had that, it would be a fraud upon the company to give him the full benefit of the compromise, and the money paid upon the release, and then allow him to inflict upon the company the evil of litigations, they seem to have been seeking, in a just and honorable manner, to avoid, with the object in view of proceeding to operate the new company without embarrassment.

The refusal of the court to admit, in evidence, the original deed of trust, and subsequent decree of foreclosure in the federal court, seems to have been based upon the idea that they were *res inter alios acta*. We do not think this a case to which that doctrine applies. Nothing done *between others* can divest a right, or impose a duty, or create an estoppel, as to one not a party to, or in some way represented in, the transaction. But, in making out a chain of title, it is of more frequent occurrence than otherwise, that deeds, judgments and decrees must be used to show transmission of rights. They are admissible for the purpose, and their effect is to be determined by the court and jury. It is proper, now, to consider the effect of the excluded instruments, to see if defendant was injured by their exclusion.

No question is made in this case of the power of the "Little Rock and Fort Smith Railway company" to execute the deed of trust in 1869. It was duly recorded, and at the time of plaintiff's purchase he was a director in the company, and chargeable with actual, as well as constructive, notice of its existence and provisions.

It is now too well settled for discussion that mortgages of future acquisition of property, by railroad companies, are upheld in equity, and liberally enforced. The necessity for these improvements for the convenience of traffic, and the development of the wealth of the country, is everywhere

5. MORT-GAGE: Of future acquisitions.

acknowledged.    The enterprising men who plan and build them are dependent upon capitalists for the advancement of means; and public policy demands that they should be able to give securities upon the results of that capital when put into the business of the road, and changed to road-bed, equipments, buildings, fixtures, rolling-stock, and other property.    The capital required is so vast that, otherwise, few roads could be built.

In this, as in many other respects, the progress of the useful arts, and the requirements of an advancing civilization, with the improved methods of commerce, have gradually brought the courts to a relaxation of strict legal doctrines, and a closer adaptation of them to the more liberal and flexible doctrines of equity.    The conservatism of the law judges has ever been, in England and America, more rational than stubborn.    The influence of the civil law in commercial affairs especially, operating primarily upon the courts of equity, and fixing the rights of vast numbers of men, in vast property interests, has been, from time to time, recognized by the courts of law, which have lent their aid to protect the rights which courts of equity have established.

Whilst it still remains true at law, as formerly, that one can not sell nor mortgage that which he hath not, and the attempt to do so is void, yet courts of law can not, nor are they disposed to ignore the fact that courts of equity hold differently; and they should give full effect to the decree in equity based upon the equity doctrine.  · To refuse to do so would produce interminable confusion.    It would be reasoning too nicely for courts of law to say that a decree in equity, operating *in rem* upon property, shall not be regarded in a collateral proceeding at law, as fixing or transferring any right, unless that right be one which a court of

law would have recognized also, and enforced by such methods as it could. There does not seem any safe ground for courts of law, acting in co-ordination with courts of equity, and as complements of each other, but to hold the foreclosure of an equitable lien, when made, as effective, for all purposes, and against all persons, as the foreclosure of a legal lien would have been.

Equity treats a mortgage of property to be afterwards acquired as a contract, binding in conscience to execute a mortgage upon it at the very instant it comes into being, and will enforce specific performance. It does more: It considers it as already done if no specific performance be requested; and then, by virtue of the equitable doctrine of notice, binds everybody to respect the equitable lien who knows of it; or, without knowing of it, has got the property without valuable consideration. In this case there was not only the equitable duty to execute a mortgage or deed of trust, on these switches, but an express contract to do so, in terms as explicit as could be drawn. The lien attached as soon as they were brought. Page knew of it, and took them not for any new consideration, but a pre-existing debt, and that, too, in the face of an express provision in the deed of trust that they could not be sold, save by the trustees themselves or the mortgagors with the trustees' assent. He stands in the position of a subsequent purchaser with full notice of the prior equities of the bondholders, and can not complain if he is held to the same consequences of a foreclosure of those equitable rights which would have attached to a foreclosure of a deed of trust strictly legal.

The general rule is that the foreclosure of a first mortgage gives title and *right of possession* against a subsequent mortgagee or purchaser not made a party, and not in possession. This would not, of course, *divest* any right of

possession the second mortgagee might have been able to assert against the mortgagor and first mortgagee, if any such exists.   But in this case there was none.   After default, the right of the trustees to possession became absolute, and that possession, transferred to the purchaser on foreclosure, became absolute in him.   All the right Page ever had was a right of redemption, and a right of possession at the will of the trustees after default.   None of those rights were affected by the decree to which he was not a party.   He does not wish to redeem.   The deed of trust and the decree would have shown that the right of property was not in the company when Page bought, but equitably in the trustees, as a security for a debt; that the possession of the company depended on the will of the trustees after default; and that the will had been determined by the foreclosure, sale and actual possession by the purchasers. They would, in short, have shown that he had only a right of redemption, and as he had not offered to redeem, that he could not be injured by a conversion.   The court erred in excluding the deed of trust and the decree as evidence of title in defendant.   For this, as well as for the error in instructions above indicated, and in refusing a new trial, reverse the judgment, and remand the cause for a new trial, and other proceedings consistent with this opinion.